IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE



**FILED**

**September 13, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

| | | |
|---|---|---|
| CAROLYN SUE IVEY, | ) | |
| | ) | **FOR PUBLICATION** |
| Plaintiff/Appellant | ) | |
| | ) | **FILED: <u>September 13, 1999</u>** |
| v. | ) | |
| | ) | KNOX CHANCERY |
| TRANS GLOBAL GAS & OIL, | ) | |
| d/b/a BREAD BOX FOOD STORE, | ) | Hon. Frederick D. McDonald |
| STORE NO. 42, | ) | |
| | ) | No. 03S01-9804-CH-00037 |
| Defendant/Appellee. | ) | |
| | ) | (Workers' Compensation) |
| | ) | |

For the Appellant:

David H. Dunaway
Dunaway & Associates
LaFollette, Tennessee

For the Appellee:

Imogene A. King
Frantz, McConnell & Seymour, LLP
Knoxville, Tennessee

# OPINION

REVERSED IN PART;
AFFIRMED AS MODIFIED IN PART

BARKER, J.

**OPINION**

In this workers' compensation action, the employee, Carolyn Sue Ivey (plaintiff), filed a claim for relief based upon a chronic mental disorder that arose after she was robbed at gunpoint while working at a convenience store. The trial court found that the plaintiff is permanently and totally disabled, as defined in Tenn. Code Ann. § 50-6-207(4)(B) (Supp. 1998), and awarded benefits to be paid until the plaintiff reaches the age of sixty-five.

The employer, Trans Global Gas & Oil, Inc. (defendant), appealed the trial court's decision to the Special Workers' Compensation Appeals Panel for findings of fact and conclusions of law pursuant to Tenn. Code Ann. § 50-6-225(e)(5) (Supp. 1998). The Panel affirmed the trial court's finding that the plaintiff is permanently and totally disabled, but determined that the plaintiff's injury pertains to her mental faculties as enumerated at Tenn. Code Ann. § 50-6-207(3)(A)(ff). Under that statute, the Panel concluded that the plaintiff is entitled to recover benefits for the scheduled period of four hundred weeks.

The plaintiff, thereafter, filed a motion for full-court review of the Panel's decision pursuant to Tenn. Code Ann. § 50-6-225(e)(5)(B). We granted the appeal to address whether the plaintiff's injury pertains to a scheduled member under Tenn. Code Ann. § 50-6-207(3)(A)(ff) and whether she is permanently and totally disabled as defined at Tenn. Code Ann. § 50-6-207(4)(B). For the reasons that follow, we conclude that the plaintiff's injury falls within the schedule for mental faculty injuries at section 207(3)(A)(ff). Accordingly, both the trial court and the Panel erred in adjudging the plaintiff as permanently and totally disabled. The judgments of the trial court and the Panel are reversed in that respect.

2

We affirm the Panel's decision to treat the plaintiff's mental disorder as a scheduled-member injury under section 207(3)(A)(ff).  However, because the plaintiff has not suffered a total loss of her mental faculties, as provided in section 207(3)(A)(ff), we find that she is not entitled to recover benefits for the maximum four hundred week period.  Based upon the evidence in this case, we modify the plaintiff's recovery to three hundred weeks.

## BACKGROUND

The plaintiff was thirty-nine years old at the time of trial and had been employed at the defendant's Bread Box Food Store since 1994.  Initially, she worked as a clerk operating the convenience store's cash register, stocking food shelves, and cleaning the store property.  After approximately one year, she was promoted to the position of assistant manager on the 2:30 p.m. to 11:00 p.m. shift.  Her work duties remained essentially the same except that she became responsible for paper work, bank deposits, and keys to the store.

On April 3, 1996, while working alone at the store, the plaintiff was robbed by a female assailant who pointed a cocked handgun directly in her face.  The plaintiff complied with the assailant's demands and did not suffer any physical injury during the robbery.  Since that time, however, the plaintiff has complained of chronic emotional problems including stress, anxiety, and depression.  She has expressed a constant fear that the assailant will return to kill her and is afraid to leave her house unless accompanied by friends or relatives.  She also has difficulty concentrating and thinking clearly when around large groups of people and is reluctant to interact with strangers.  Although the defendant has offered her several employment opportunities since the

robbery, she has not engaged in any gainful employment aside from babysitting a relative's child in her home for fifty dollars a week.

Approximately one week after the robbery, the plaintiff was referred to Dr. Kelley Walker for psychiatric treatment and evaluation.[1]  Dr. Walker became the plaintiff's primary treating physician between April 11, 1996, and the trial date on December 10, 1997.  Dr. Walker testified in her deposition that she initially diagnosed the plaintiff as suffering from an acute adjustment disorder with anxiety.  Through both medicine and counseling, she had expected the plaintiff to recover from the emotional trauma and to return to work eventually.

As part of the initial treatment, Dr. Walker encouraged the plaintiff to seek psychotherapy from a list of recommended psychologists.[2]  Dr. Walker testified that psychotherapy offered a potential benefit to the plaintiff during the early acute stages of her emotional injury.  The record reflects that the plaintiff went to two psychotherapy sessions under the care of a Dr. Slaven[3] in April and May of 1996.  The plaintiff declined further treatment by Dr. Slaven and told Dr. Walker that the sessions with Dr. Slaven made her feel stupid.  Dr. Walker urged the plaintiff to obtain psychotherapy from other psychologists and recommended that she see Dr. Denise Tope.  Despite Dr. Walker's advice, the plaintiff did not pursue additional psychotherapy.[4]

_____

[1]The plaintiff was referred to Dr. Walker by Dr. John Law, a family-practice physician at St. Mary's Walk-in Clinic in East Towne.  Dr. Walker is a board-certified psychiatrist with the Center for Family Psychiatry in Knoxville.

[2]Black's Law Dictionary 1227 (6th ed. 1990) defines psychotherapy as:
[a] method or system of alleviating or curing certain forms of disease, particularly diseases of the nervous system or such as are traceable to nervous disorders, by suggestion, persuasion, encouragement, the inspiration of hope or confidence, the discouragement of morbid memories, associations or beliefs, and other similar means addressed to the mental state of the patient, without (or sometimes in conjunction with) the administration of drugs or other physical remedies.

[3]Dr. Slaven's full name and qualifications were not included in the record on appeal.

[4]The evidence is in dispute as to why the plaintiff did not receive further psychotherapy.  Some proof indicates that the plaintiff was reluctant to meet and to develop relationships with new counselors.  However, the plaintiff contends that the lapse in therapy was due to a lack of financial support from the

4

The plaintiff's treatment consisted primarily of medicine and psychiatric counseling from Dr. Walker. Dr. Walker prescribed various anti-depressant and anti-anxiety medications for the plaintiff and monitored her condition during their meetings. After several months of evaluation, Dr. Walker noted that the plaintiff's symptoms were becoming chronic. Those symptoms included intense paranoia when in public areas, fear of strangers and crowded places, difficulty sleeping and relaxing, occasional flashbacks and anxiety attacks, and feelings of hopelessness and depression. Dr. Walker opined that the plaintiff's symptoms were all related to the trauma that she experienced from the robbery. Because those symptoms persisted, Dr. Walker ultimately diagnosed the plaintiff with posttraumatic stress disorder.

Dr. Walker testified that during the early stages of the plaintiff's disorder, she encouraged the plaintiff to return to some type of gainful employment.[5] Dr. Walker opined at that time that subsequent employment would help the plaintiff to rebuild her self-esteem and would instill productivity back into her life. With the assistance of Jane Colvin-Roberson, a case manager hired by the defendant, Dr. Walker discussed options for the plaintiff's gradual return to the work force. The defendant offered the plaintiff several employment options during the summer and fall of 1996, including her previous position at the Bread Box Food Store, similar positions at other nearby convenience stores owned by the defendant, and a position with one of the defendant's larger grocery stores.[6] The plaintiff also considered working in maid

defendant and the failure of her case manager, Jane Colvin-Roberson, to facilitate the necessary insurance coverage. Ms. Colvin-Roberson testified at trial that she would have supported and made arrangements for the psychotherapy treatment had she known it was recommended by Dr. Walker. The trial court did not find any party at fault in the plaintiff's failure to receive psychotherapy. The evidence does not preponderate against that finding.

[5]Dr. Walker released the plaintiff for work on July 16, 1996. Approximately one week later, the defendant terminated the plaintiff's temporary total disability benefits.

[6]The defendant's operation manager, Kenneth Raby, testified at trial that the plaintiff was a good employee. Mr. Raby stated that in light of the plaintiff's work history with the defendant, he wanted her to return to work in one of the defendant's store locations.

service for a motel as she had previously done. Nevertheless, she did not return to any form of employment except a part-time babysitting job.

On January 16, 1997, Dr. Walker reported to Ms. Colvin-Roberson that the plaintiff had reached maximum medical improvement. Dr. Walker opined that the plaintiff still suffered from post traumatic stress disorder with a moderate permanent clinical impairment. Due to the plaintiff's chronic anxiety and fear of public places, Dr. Walker changed her initial opinion concerning the plaintiff's ability to work. Dr. Walker testified that based upon her most recent evaluations of the plaintiff in the Fall of 1997, she believed that the plaintiff would not be able to sustain meaningful employment outside her home.[7]

Dr. Walker's opinion was corroborated by Dr. Jerry B. Lemler,[8] who examined the plaintiff at the request of plaintiff's counsel. Dr. Lemler conducted a ninety-minute interview of the plaintiff on April 15, 1997. Based upon his evaluation and the initial patient report from Dr. Walker, Dr. Lemler diagnosed the plaintiff with post traumatic stress disorder. He characterized her condition as "moderate" under the fourth edition of the American Medical Association (AMA) guidelines, indicating that the plaintiff has some, but not all, useful functioning. Dr. Lemler testified in his deposition that the plaintiff's high anxiety level inhibits her ability to focus and to engage in meaningful social interaction. As related to employment, Dr. Lemler opined that the plaintiff would be unable to concentrate for any sustained periods of time and would be unable to

---

[7]Dr. Walker testified that the plaintiff's emotional condition worsened during the month before the scheduled trial date. Dr. Walker stated that the plaintiff's increased stress level could have been due, in part, to the pending trial proceedings. While she noted that the plaintiff's condition would probably improve after trial, she reiterated that the plaintiff would not be able to maintain a consistent work schedule at that time or in the foreseeable future.

[8]Dr. Lemler is a full-time family practitioner at the Family Medical Clinic in Harrogate, Tennessee. He also practices psychiatry on a part-time basis from his home in Lafollette.

tolerate ordinary work stresses outside of her home. He concluded that the plaintiff could not engage in gainful employment on a consistent basis.

Over the objection of the defendant's counsel, both Dr. Lemler and Dr. Walker assessed the plaintiff's mental impairment at fifty percent to the body as a whole. The impairment rating came from an outdated second edition of the AMA guidelines. Both doctors acknowledged that under the current fourth edition of the AMA guidelines, there is no scientifically accepted method for assigning a percentage of impairment to emotional injuries. The fourth edition of the AMA guidelines cautions that the use of percentages for psychological impairments is highly subjective. Nevertheless, both doctors relied upon the second edition of the AMA guidelines, at the request of plaintiff's counsel, to assign a percentage of impairment. The doctors opined that the plaintiff's impairment will most likely persist for the remainder of her life.

Dr. Norman Hankins, a vocational expert, testified by deposition that he evaluated the plaintiff on two separate occasions to assess any vocational disability. Dr. Hankins first interviewed the plaintiff on March 26, 1997. He examined the plaintiff's emotional condition, employment history,[9] and the initial patient report from Dr. Walker. He found that the plaintiff had no special or transferable vocational skills and that she had been working in manual labor most of her life. He also found that the plaintiff had quit high school after the tenth grade and had never obtained a GED or further education. Dr. Hankins testified that the plaintiff had an average ability to learn and an IQ in the "average" range; however, he assessed her reading and mathematical skills as generally poor for her age. Based upon his findings from the first interview, he rated the plaintiff as forty-eight percent vocationally impaired.

---

[9]The plaintiff's employment history includes: school janitorial service; spinning machine operations for the Standard Knitting Mills; motel maid service; restaurant food preparation; meat packing; and work at the defendant's Bread Box Food Store.

7

Dr. Hankins reevaluated the plaintiff on December 4, 1997. During the second evaluation, he relied upon the depositions of Dr. Walker and Dr. Lemler and found that the plaintiff's emotional problems had intensified. Dr. Hankins opined that the plaintiff suffered from anxiety and other conditions that would severely limit her ability to perform in gainful employment. He, therefore, concluded that the plaintiff was one hundred percent vocationally impaired.

The trial court reviewed the above evidence and concluded that the plaintiff is permanently and totally disabled. Tenn. Code Ann. § 50-6-207(4)(B) (Supp. 1998). The trial court determined that the plaintiff's baby-sitting activity constituted three percent vocational ability, but that the plaintiff is nevertheless totally disabled due to her inability to work in the general market place. The Special Workers' Compensation Appeals Panel affirmed the trial court's finding of permanent total disability, but concluded that the plaintiff's recovery should be limited to four hundred weeks under the schedule for mental faculty injuries. See Tenn. Code Ann. § 50-6-207(3)(A)(ff). The plaintiff requests this Court to reverse the Panel's decision and to reinstate the judgment of the trial court.

**DISCUSSION**

The questions in this appeal are the extent of the plaintiff's vocational disability and whether her injury is to a scheduled member under Tenn. Code Ann. § 50-6-207(3)(A)(ff). The extent of a vocational disability is a question of fact that we review de novo with a presumption of correctness. Tenn. Code Ann. § 50-6-225(e)(2); Collins v. Howmet Corp., 970 S.W.2d 941, 943 (Tenn. 1998). We are not bound by the trial court's factual findings, but rather examine those findings independently to determine where the preponderance of the evidence lies. Id. at 943; Galloway v.

8

Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991). This case also involves questions of law pertaining to the construction of the workers' compensation statutes and the application of the law to the facts. Our review in that regard is de novo without a presumption of correctness. Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997); Spencer v. Towson Moving and Storage, 922 S.W.2d 508, 509 (Tenn. 1996).

The Workers' Compensation Act classifies vocational disabilities into four distinct categories, with each category serving a specific compensation goal. Davis v. Reagan, 951 S.W.2d 766, 767 (Tenn. 1997); Roberson v. Loretto Casket Co., 722 S.W.2d 380, 383 (Tenn. 1986). Those categories are: (1) temporary total disabilities; (2) temporary partial disabilities; (3) permanent partial disabilities; and (4) permanent total disabilities. Tenn. Code Ann. § 50-6-207(1) -- 207(4) (Supp. 1998). In this case, we are concerned with the interrelation between permanent total disabilities and the schedule of injuries listed within the statute governing permanent partial disabilities.

The plaintiff received temporary total disability benefits from the defendant until she was released by Dr. Walker to return to work on July 16, 1996. At the conclusion of trial, the trial court awarded benefits to the plaintiff for a permanent total disability based upon the testimony of the plaintiff's psychiatrists and a vocational expert. The defendant did not present any evidence to refute the testimony of the plaintiff's experts. While the evidence would ordinarily be sufficient to affirm the trial court's finding of permanent total disability, our analysis in this case is complicated by the schedule of injuries under Tenn. Code Ann. § 50-6-207(3)(A)(a)-(ff).

Tenn. Code Ann. § 50-6-207(3)(A) governs recovery for permanent partial disabilities and contains the list of scheduled-member injuries. This Court has previously interpreted section 207(3)(A) as follows: "[A]n employee sustaining either a disability to a scheduled member or a disability adjudged both permanent and partial

9

to the body as a whole may be eligible for permanent partial disability benefits."
Davis, 951 S.W.2d at 767. Benefits for permanent partial disabilities are paid either as scheduled or for a period of time up to four hundred weeks. Tenn. Code Ann. § 50-6-207(3)(A) -- 207(3)(F).

The Panel reviewed the schedule of injuries under section 207(3)(A) and determined that the plaintiff's injury fell within the schedule at section 207(3)(A)(ff). That section reads, "[f]or the total and permanent loss of the sight of both eyes, or the loss of both arms at the shoulder, or complete and permanent paralysis, or *total and permanent loss of mental faculties*, sixty-six and two-thirds percent (66 2/3%) of the average weekly wages during four hundred (400) weeks." Tenn. Code Ann. § 50-6-207(3)(A)(ff) (emphasis added). We agree with the Panel's decision to treat the plaintiff's injury as one pertaining to mental faculties under section 207(3)(A)(ff).

Although this Court has previously upheld workers' compensation benefits for mental injuries,[10] the question of whether those injuries are scheduled under section 207(3)(A)(ff) appears to be one of first impression. The term "mental faculties" is not defined in the workers' compensation statutes. However, the words "mental" and "faculties" are defined separately in Black's Law Dictionary (6th ed. 1990). The word "mental" refers to the mind and includes factors such as cognition, intellect, and emotions, as distinguished from the physical body. Id. at 985. The word "faculties" means abilities and powers to perform certain acts and functions. Id. at 593.

_____

[10]See Hill v. Eagle Bend Mfg., Inc., 942 S.W.2d 483, 488 (Tenn. 1997) (allowing recovery for a mental disorder that arose out of a physical work-related injury); Beck v. State, 779 S.W.2d 367, 370 (Tenn. 1989) (allowing recovery where an employee was sexually accosted by a stranger in the course of employment). Generally, a mental injury is compensable under workers' compensation when it results from a physical, work-related injury or is caused by an identifiable stressful, work-related event producing a sudden mental stimulus such as fright, shock, or excessive unexpected anxiety. See Gatlin v. City of Knoxville, 822 S.W.2d 587, 591-92 (Tenn. 1991); Jose v. Equifex, Inc., 556 S.W.2d 82, 83-84 (Tenn. 1977). The parties in this case do not dispute that the plaintiff's mental injury is compensable under the workers' compensation laws.

Relying on those definitions, we conclude that the mental faculties schedule under section 207(3)(A)(ff) was intended to encompass two basic types of injuries. The first type involves mental impairment that results from physical trauma to the brain. An example of this type of injury is where an employee suffers a physical blow to the head, causing a brain injury, while performing a work-related task. With the assistance of expert medical and psychological testimony, the employee can demonstrate the extent of brain damage and how that damage has decreased his or her ability to think and to perform mental operations. The employee's claim for workers' compensation benefits would be based, at least in part, on the degree of impaired cognitive functioning.

The second type of mental faculties injury under section 207(3)(A)(ff) involves a mental or emotional disorder that results from a non-physical injury. As this Court has previously discussed in Gatlin, injuries that are completely mental in nature are compensable under workers' compensation when they are caused by an identifiable stressful, work-related event that produces a sudden mental stimulus such as fright, shock, or excessive unexpected anxiety. See 822 S.W.2d at 591-92. The absence of physical harm or physical trauma does not lessen the possible effects that such injuries can have on both cognitive and vocational abilities.

In this case, for example, the plaintiff's experience from the robbery has severally damaged her emotional well-being and has dominated the way she thinks and conducts herself in public places. Although some evidence indicates that the plaintiff has retained a significant amount of her cognitive functioning,[11] the evidence also shows that her emotional injury has left her in a state of constant anxiety and has

---

[11]The record shows that the plaintiff has maintained relationships with her family and has been able to drive her daughter to and from school. She has also provided baby-sitting services for a relative's child without any apparent complication.

prevented her from thinking rationally about many human interactions. The plaintiff's psychiatrists conducted several standardized tests on the plaintiff to assess the severity of her mental impairment. Both rated the plaintiff's mental injury as "moderate" and testified that her cognitive functioning was below average as a result of the post traumatic stress disorder.[12] Based upon the expert proof, we conclude that the plaintiff's injury is completely related to her mental faculties and should be adjudicated under section 207(3)(A)(ff).

The remaining question is whether the lower courts properly held that the plaintiff is permanently and totally disabled. Permanent total disability is defined at Tenn. Code Ann. § 50-6-207(4)(B) in pertinent part, "[w]hen an injury not otherwise specifically provided for in this chapter, as amended, totally incapacitates the employee from working at an occupation that brings such employee an income, such employee shall be considered "totally disabled," and for such disability compensation shall be paid as provided in subdivision (4)(A) . . . ." Benefits for permanent total disabilities are to be paid by the employer until the employee reaches the age of sixty five. Tenn. Code Ann. § 50-6-207(4)(A)(i).

The plaintiff contends that she is permanently and totally disabled under section 207(4)(B) based upon the trial court's finding that she is unable to return to gainful employment. However, because her injury pertains to a scheduled member under section 207(3)(A)(ff), we conclude that her vocational disability cannot be adjudged as permanent and total under the workers' compensation laws. This Court has previously held that where an employee's only injury is to a scheduled member, he or she may receive only the amount of compensation provided for in the statutory

_____

[12]As part of their evaluation, both psychiatrists analyzed the plaintiff's mental injury under the Global Assessment of Function (GAF) scale. The GAF ranks mental functioning on a scale of 0-100, with the range of 0 to 30 being catatonic or near death and the score of 90 or greater being manic. Dr. Walker rated the plaintiff at 45 and Dr. Lemler rated her at 50 to 55, all below the average range of 60-70.

12

schedule. See Wade v. Aetna Cas. and Sur. Co., 735 S.W.2d 215, 217 (Tenn. 1987).

In those cases, the courts are not free to assess the employee's disability in terms of

the body as a whole unless the injuries at issue are not specifically enumerated as

scheduled members. Smith v. Empire Pencil Co., 781 S.W.2d 833, 837 (Tenn. 1989);

Blackburn v. Allied Chem. Corp., 616 S.W.2d 600, 602 (Tenn. 1981); Genesco, Inc. v.

Creamer, 584 S.W.2d 191, 194 (Tenn. 1979). Therefore, we conclude that the Panel

erred in affirming the trial court's finding of permanent and total disability.

From our research of the workers' compensation statutes, it is clear that the

legislature, at one time, permitted the recovery of total disability benefits for mental

faculty injuries. See Code 1932, § 6878(e). The definition of total disability, before it

was amended, read as follows:

> The total and permanent loss of the sight of both eyes, or the loss of
> both arms at the shoulder, or complete and permanent paralysis, or total
> and permanent loss of mental faculties, or any other injury which totally
> incapacitates the employee from working at an occupation which brings
> him an income, shall constitute total disability.

Code 1932, § 6878(e). In 1941, the legislature amended the definition of total

disability and moved the language in section 6878 into the statute governing

permanent partial disabilities. 1941 Tenn. Pub. Acts, ch. 90, § 5(c). The injuries listed

in section 6878 were included in the schedule of injuries similar to the scheme

provided under the current workers' compensation law. Compare 1950 Code Supp., §

6878(c) with Tenn. Code Ann. § 50-6-207(3)(A)(ff). The legislative history concerning

the amendments is not available.

Wisely or unwisely, the legislature has determined that injuries to an

employee's mental faculties constitute scheduled-member injuries under the statute

for permanent partial disabilities. It is not within the courts' authority to question or

13

judge the wisdom of the statute. <u>Harrison v. Schrader</u>, 569 S.W.2d 822, 828 (Tenn. 1978); <u>State ex rel. Motlow v. Clark</u>, 173 Tenn. 81, 114 S.W.2d 800, 803 (Tenn. 1938); <u>Hamblen County Educ. Ass'n v. Hamblen County Bd. of Educ.</u>, 892 S.W.2d 428, 432 (Tenn. App. 1994), *perm. app. denied* (Tenn. 1995). Were we to adopt the plaintiff's position and adjudge her as permanently and totally disabled, we would completely emasculate the language and intent of the statutory schedule.[13]

## APPLICATION

Under the unique facts of this case, there is no dispute that the plaintiff has suffered a work-related mental injury that has caused her emotional suffering and has severely diminished her ability to work. However, our legislature has set a high standard for the recovery of benefits under the schedule for mental faculty injuries. <u>See</u> Tenn. Code Ann. § 50-6-207(3)(A)(ff). The recovery schedule is capped at four hundred weeks for employees who have totally and permanently lost their mental faculties. The record in this case is clear that, although the plaintiff has suffered a permanent mental injury, she has not totally lost her mental faculties. We must, therefore, conduct a de novo review of the record to determine the appropriate duration of the plaintiff's recovery. The amount of periodic benefits to be paid to the plaintiff has not been disputed in this appeal.

---

[13]The plaintiff legitimately questions the fairness of limiting her recovery under section 207(3)(A)(ff) in light of her inability to return to gainful employment. We agree with the plaintiff that there are possible scenarios where an employee suffers from a mental disorder, short of a total loss of mental faculties, and is unable to return to work. Moreover, we cannot conceive of any case where an employee permanently and totally loses his or her mental faculties, but is only partially disabled within the meaning of Tenn. Code Ann. § 50-6-207(3)(A). We are also struck by the apparent unfairness of a worker who becomes totally and permanently disabled as a result of a back injury, for example, receiving benefits to age 65; yet the same worker who suffers a more serious injury and is unable to work due to a total and permanent loss of mental faculties is limited to 400 weeks of benefits. The legislature, nevertheless, has seen fit to treat such injuries as permanent partial disabilities under the workers' compensation statutes. Until the statute is given further address by the legislature, we must follow the schedule and scheme of the statute and limit the plaintiff's recovery accordingly.

14

We have thoroughly reviewed the record in this case including the extent of the plaintiff's injury, her age and work history, her educational background, and the availability of any transferable work skills that she could utilize in future employment. The plaintiff's psychiatrists testified that the plaintiff's mental injury was chronic and likely to persist throughout the remainder of her life. Relying on an outdated AMA guideline, the psychiatrists rated the plaintiff as fifty percent anatomically impaired to the body as a whole.

On the separate question of vocational disability, the plaintiff's expert, Dr. Hankins, testified that the plaintiff's mental injury prevents her from working in jobs that require her to interact with strangers and large groups of people. Dr. Hankins determined that the plaintiff has no specialized work skills and that her limited education greatly reduces the opportunities that she might otherwise have in the labor market. After reviewing the testimony of the plaintiff's psychiatrists, Dr. Hankins concluded that the plaintiff could not engage in employment on a sustained basis. He did not express an opinion on the plaintiff's baby-sitting activities.

In view of the plaintiff's limited job training, education, considerable psychological restrictions, and the lack of transferable job skills, we agree that her ability to earn a living has been severely limited by her mental injury. Nevertheless, we also acknowledge that the plaintiff has successfully worked as a part-time babysitter and could possibly work in other capacities that accommodate her mental disorder. Having reviewed those factors together with the remaining evidence in the record, we conclude that the plaintiff's percentage of vocational disability is seventy-five percent. The duration of the plaintiff's recovery, as provided in Tenn. Code Ann. § 50-6-207(3)(A)(ff) and 207(3)(D), shall be three hundred weeks.

Costs of this appeal shall be taxed to the plaintiff, Carolyn Sue Ivey, for which execution shall issue if necessary.

_____
WILLIAM M. BARKER, JUSTICE

CONCUR:

Anderson, C.J., Drowota, Holder, JJ.
Birch, J., not participating.

16