IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 7, 2005 Session

## W. H. SAYLOR v. LAKEWAY TRUCKING, INC.

**Appeal from the Circuit Court for Hamblen County**
**No. 99CV205     Kindall T. Lawson, Judge**

**No. E2004-00427-SC-R3-CV - Filed November 29, 2005**

In this workers' compensation case, the employee sought benefits due to mental injuries that allegedly arose out of his contact with hazardous material in the course of his employment. We conclude that the record and the applicable law support the trial court's determination that the employee's mental injuries arose out of and in the course of his employment and that the employee is 100% permanently disabled with respect to his mental faculties. Accordingly, we affirm the judgment of the trial court.

**Tenn. Code Ann. § 50-6-225(e)(3); Judgment of the Trial Court Affirmed.**

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON and ADOLPHO A. BIRCH, JR., JJ., joined.

Gene Paul Gaby, Greeneville, Tennessee, for the Defendant-Appellant, Lakeway Trucking, Inc.

J. Eric Harrison and J. Randall Shelton, Morristown, Tennessee, for the Plaintiff-Appellee, W. H. Saylor.

**OPINION**

The plaintiff, William H. Saylor ("Saylor"), was employed as a truck driver for the defendant, Lakeway Trucking, Inc. ("Lakeway"). On June 15, 1999, Saylor was transporting hazardous liquid in a flatbed trailer truck to Clive, Utah. Saylor contends that the liquid splashed on him while he was investigating a leak in the pods containing the liquid. Following the incident, Saylor was diagnosed with post-traumatic stress disorder, chronic depression, fatigue, and anxiety.

Saylor filed a workers' compensation claim against Lakeway contending that he suffered mental injuries as a result of the incident. At the conclusion of trial, the trial court found that Saylor sustained emotional and psychological trauma to his mental faculties as a result of the June 1999 incident arising out of and occurring in the course of Saylor's employment with Lakeway. The trial court further found Saylor 100% permanently disabled as to his mental faculties.

Lakeway appealed, and the appeal was referred to the Special Workers' Compensation Appeals Panel pursuant to Tennessee Code Annotated section 50-6-225(e)(3) (2005). Following oral argument before the Panel, the case was transferred to the full Court for review.

## ANALYSIS

To be compensable under the workers' compensation statutes, an injury must arise out of and occur in the course of employment. Tenn. Code Ann. § 50-6-102(12) (1999). The phrase "arising out of" refers to the cause or origin of the injury, and "in the course of" relates to the time, place, and circumstances of the injury. Hill v. Eagle Bend Mfg., Inc., 942 S.W.2d 483, 487 (Tenn. 1997). An accidental injury arises out of and is in the course of employment if it has a rational connection to the employment and occurs while the employee is engaged in work the employee was employed to perform. Guess v. Sharp Mfg. Co. of Am., 114 S.W.3d 480, 484 (Tenn. 2003).

During trial, testimony was presented by Saylor and Lloyd Orrick ("Orrick"), another truck driver employed by Lakeway, regarding the June 1999 events. According to their testimony, on June 14, 1999, Saylor and Orrick each drove a flatbed trailer truck with pods containing hazardous liquid from Tennessee to a disposal site in Clive, Utah. The workers at the disposal site refused to accept either load and ordered Saylor to transport the material from the area due to fears that the material would explode.

Saylor and Orrick drove their trucks containing the hazardous material to a nearby truck stop, where they remained overnight. The following day, Orrick drove his truck back to the disposal site while Saylor remained at the truck stop. When the workers at the disposal site again refused to accept the material, Orrick returned to the truck stop and parked his truck at the end of the parking lot at a distance from the restaurant. Saylor testified that he moved his truck beside Orrick's truck because workers at the disposal site had expressed fears that the hazardous material in his truck would explode. At this point the testimony of Saylor and that of Orrick diverge.

Saylor testified that as he was backing his truck into the parking space, he saw Orrick standing near the trailer and waving his arms. Saylor did not observe anything behind his truck, so he continued to back the truck into the parking space. When Saylor stopped his truck, Orrick opened the passenger door and informed Saylor that one of the pods in his truck was leaking hazardous material. The material had splashed on Orrick's shirt. Saylor stated that he exited the truck and ran to the back of the trailer where the liquid material "sloshed" on him. Saylor testified that the liquid went in his mouth and on the side of his face, on his chest, and on his shirt. Saylor stated to Orrick, "You've got it on you, and it's going to kill you. Now, if it ain't killed me, too, now."

Orrick offered a different version of the events. Orrick testified that the material "gushed out" of one of the pods as Saylor was backing into the parking space. Orrick began waving his hands and yelled for Saylor to stop, but Saylor did not see him. Orrick stated he ran between the trucks and "beat" on one of the truck's doors. As Orrick ran toward the front of Saylor's truck, the material splashed on Orrick. Orrick alerted Saylor to the leak. Saylor then instructed Orrick to back Saylor's

truck into the parking space while Saylor investigated the leak. Orrick testified that as he was backing the truck into the parking space, he observed Saylor "turn around and brush himself off."

Saylor and Orrick showered and then contacted Bobby Noe, an employee of Lakeway, to inform him of the events. Noe instructed them to remain in Clive, Utah, until the next day. Saylor testified that he felt ill and was afraid he and Orrick might die. The next day, transportation authorities inspected Saylor's truck and sealed two pods that had been leaking the material.

Due to these differing versions of events, Lakeway contends that the trial court erred in accrediting Saylor's testimony and concluding that Saylor suffered a compensable work-related injury on June 15, 1999. The trial court's factual findings on issues concerning the witnesses' credibility and the weight to be given their testimony, however, are entitled to considerable deference upon appeal. Reeser v. Yellow Freight Sys., Inc., 938 S.W.2d 690, 692 (Tenn. 1997). The trial court weighed the credibility of both Saylor and Orrick and found that the hazardous material spilled on Saylor. The evidence does not preponderate against the trial court's conclusion.

Although we have concluded that the evidence sufficiently establishes that Saylor came into contact with the hazardous material, we must determine whether Saylor's mental injury is rationally connected to his contact with the material. An employee who suffers an injury that is purely mental in nature may be compensated under the Workers' Compensation Act. Guess, 114 S.W.3d at 484. Tennessee Code Annotated section 50-6-207(3)(A)(ii)(ff) (1999)[1] provides that injuries to an employee's mental faculties are scheduled member injuries. Ivey v. Trans Global Gas & Oil, 3 S.W.3d 441, 448 (Tenn. 1999). We have previously interpreted this subsection as providing for workers' compensation benefits for two types of injuries to an employee's mental faculties: 1) mental injuries that resulted from physical trauma to the brain; and 2) mental or emotional impairment that resulted from non-physical harm or trauma. Id. at 447.

Saylor maintains that his injuries fall within the second category of compensable mental injuries, mental or emotional injuries that resulted from non-physical harm or trauma. This category recognizes that the absence of physical harm does not diminish the possible effects of mental injuries on cognitive and vocational disabilities. Id. These types of mental injuries are compensable only

---

[1] In 2002, Tennessee Code Annotated section 50-6-207 was amended to delete subsection (3)(A)(ii)(ff). As a result, injuries to mental faculties are no longer considered scheduled member injuries. The definition of "injury" or "personal injury" now includes "a mental injury arising out of and in the course of employment." Tenn. Code Ann. § 50-6-102(13) (2005). A "mental injury" is defined as

> a loss of mental faculties and/or a mental or behavioral disorder where the proximate cause is a compensable physical injury resulting in a permanent disability, or an identifiable work-related event resulting in a sudden or unusual mental stimulus. A mental injury shall not include a psychological or psychiatric response due to the loss of employment or employment opportunities.

Id. at (16). Because Saylor's injuries occurred in June 1999, we must analyze the issues raised in this appeal under the workers' compensation statutes in effect prior to these amendments. See Nutt v. Champion Int'l Corp., 980 S.W.2d 365, 368 (Tenn. 1998).

if they result from "an identifiable stressful, work-related event that produces a sudden mental stimulus such as fright, shock, or excessive unexpected anxiety." Id.

The performance of any contract of employment, however, produces some degree of emotional stress. Goodloe v. State, 36 S.W.3d 62, 66 (Tenn. 2001). Compensation, therefore, is available for neither emotional stress, anxiety, or worry of a general nature nor mental injuries resulting from the accumulation of normal employment-related activities. Id. Rather, the stress "must be extraordinary and unusual in comparison to the stress ordinarily experienced by an employee in the same type duty." Gatlin v. City of Knoxville, 822 S.W.2d 587, 592 (Tenn. 1991).

We have addressed the compensability of mental or emotional injuries resulting from non-physical harm or trauma in two recent cases, Ivey v. Trans Global Gas & Oil, 3 S.W.3d 441 (Tenn. 1999), and Guess v. Sharp Manufacturing Co. of America, 114 S.W.3d 480 (Tenn. 2003). In Ivey, we concluded that the plaintiff was entitled to workers' compensation benefits for a chronic mental disorder that arose after the plaintiff was robbed at gunpoint while working at a convenience store. 3 S.W.3d at 447. In Guess, however, we held that the plaintiff's chronic mental disorder that arose after she came into contact with the blood of a co-worker whom she believed was positive for the Human Immunodeficiency Virus (HIV) was not compensable. 114 S.W.3d at 487.

We explained that unlike the plaintiff in Ivey, the plaintiff in Guess was not exposed to any real danger. Guess, 114 S.W.3d at 486. The plaintiff in Guess had no proof other than mere speculation that her co-worker was HIV positive, and tests administered to the plaintiff were negative for the virus. Id. We reasoned that if the plaintiff were permitted to recover based upon mere speculation of exposure to HIV, recovery would be permitted for any exposure to a substance or situation perceived or imagined to be harmful. Id. at 487. We were unwilling to award benefits to an employee with an irrational fear of exposure to HIV who was unable to provide evidence of a medically-recognized means of transmission. Id. We held that the plaintiff's injury did not have a rational connection to her duties of employment because the injury resulted from the plaintiff's subjective impressions and not from any real danger. Id. at 486.

In contrast, the hazardousness of the material to which Saylor was exposed was not based upon mere speculation. The pods were labeled "radioactive," and Saylor and Orrick were required to transport the material to a special site in Utah to dispose of the material. Workers at the disposal site refused to accept the pods due to their fear that the material would explode. A reasonable person who had been splashed with such material under these circumstances would have believed himself to be in danger. Although tests on Saylor's clothing found no radioactive material, more than two weeks had elapsed between the incident and the tests. Saylor had been diagnosed with depression and had begun treatment before he could be assured that his clothing provided no evidence of radioactivity. Accordingly, we conclude that Saylor's mental injury is rationally connected to his contact with hazardous material that he was transporting for Lakeway.

Regardless of the nature of the injury, we recognize that causation also must be established through expert medical evidence. Fritts v. Safety Nat'l Cas. Corp., 163 S.W.3d 673, 678 (Tenn.

2005). Absolute certainty in the medical evidence, however, is not mandated. Id. Rather, any reasonable doubt must be construed in the employee's favor. Id. Benefits may be properly awarded to an employee who presents medical testimony showing that the employment "could or might have been the cause" of his or her injury when lay testimony reasonably suggests causation. Clark v. Nashville Mach. Elevator Co., 129 S.W.3d 42, 47 (Tenn. 2004).

Approximately two weeks after the incident, Saylor was examined by Dr. Dereck Cooze, who diagnosed him with anxiety and depression and prescribed medication. For the next one and one-half years, Saylor was treated by Dr. Maria Arturi, a psychiatrist, followed by Dr. Russell McKnight, another psychiatrist. Both psychiatrists treated Saylor with various antidepressant medications. Dr. McKnight testified that Saylor suffers from posttraumatic stress disorder, chronic depression, fatigue, and anxiety. Dr. McKnight opined that Saylor's symptoms and diagnosis stem from the June 1999 incident. Dr. McKnight also offered testimony regarding the various treatment that other doctors and psychiatrists provided to Saylor following the incident.

In addition to Dr. McKnight's medical testimony, other witnesses testified at trial regarding Saylor's condition both before and after the incident. Saylor testified that he was unable to sleep after the incident and experienced episodes of anxiety during which his heart would "race" as if he were having a heart attack. Nella Shaver ("Shaver") lived with Saylor and served as his caregiver from June 25, 1999, until February 2000. Shaver testified that in June 1999, Saylor called her, informed her of the incident, and asked her to stay with him. Shaver stated that when she arrived at Saylor's residence, she observed that Saylor was "in a condition that [she] had never seen him in before." Saylor was "shaky" and wept. According to Shaver, Saylor was concerned that the exposure to the hazardous material would cause cancer. Shaver stated that Saylor's condition worsened and that he was unable to properly care for himself. As a result, she decided to act as his caregiver.

As Saylor's caregiver, Shaver performed housekeeping activities, shopped for groceries, prepared meals, ensured that Saylor took his medication, drove him to the doctor, and prepared him to bathe. Because Saylor suffered from nightmares, Shaver sat with him during some nights. Occasionally, Shaver tied her ankle and Saylor's ankle together so that she could keep watch over him and prevent him from injuring himself.

Amy Fugate ("Fugate") and Margarita Williams ("Williams") were neighbors of Saylor in June 1999. Shaver, Fugate, and Williams testified that prior to the incident, Saylor was funny, friendly, and outgoing. They testified further that Saylor changed dramatically following the incident. Saylor remained inside his residence, would not care for himself, and would not eat. He did not carry out the same daily functions he performed prior to the incident. Fugate and Williams testified that they did not believe Saylor exhibited clear mental abilities following the incident.

We conclude that the medical evidence in conjunction with lay testimony regarding Saylor's condition prior to and following the incident is sufficient to establish causation. We further conclude

that the evidence sufficiently establishes that Saylor suffered a compensable mental injury that arose out of and occurred in the course of his employment with Lakeway.

We next turn to the trial court's finding that Saylor suffered 100% permanent disability to his mental faculties. The extent of an injured employee's permanent disability involves a question of fact. Lang v. Nissan N. Am., Inc., 170 S.W.3d 564, 569 (Tenn. 2005). We must review the trial court's findings of fact in a workers' compensation action de novo upon the record of the trial court, accompanied by a presumption that these findings are correct unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (1999). In reviewing documentary proof, such as expert medical testimony presented by deposition, we need not extend the same deference to the trial court's findings as required for issues involving the credibility and weight of oral testimony. Lang, 170 S.W.3d at 569. Ultimately, we must conduct an independent review of the evidence to determine where the preponderance of the evidence lies. See Tenn. Code Ann. § 50-6-225(e)(2) (1999); Cleek v. Wal-Mart Stores, Inc., 19 S.W.3d 770, 773-74 (Tenn. 2000).

An employee need not establish vocational disability or loss of earning capacity to be entitled to benefits for the loss of the use of a scheduled member. Duncan v. Boeing Tenn., Inc., 825 S.W.2d 416, 417 (Tenn. 1992). Proof of vocational disability, however, is admissible in determining the amount of scheduled member compensation. Id. at 417-18. Vocational disability results when "the employee's ability to earn wages in any form of employment that would have been available to him in an uninjured condition is diminished by an injury." Corcoran v. Foster Auto GMC, Inc., 746 S.W.2d 452, 459 (Tenn. 1988). A trial court must consider all relevant evidence, including expert and lay testimony, in determining the extent of vocational disability. Lang, 170 S.W.3d at 570. Factors that a trial court may consider include the employee's age, education, job skills and training, the extent and duration of anatomical impairment, local job opportunities, and the employee's capacity to work at the kinds of employment available to one in the employee's condition. McIlvain v. Russell Stover Candies, Inc., 996 S.W.2d 179, 183 (Tenn. 1999).

In applying these factors to the present case, we observe that Saylor was sixty-three years old at the time of trial and had an eighth grade education. He became a truck driver when he was fifteen years old and has not been employed in any other occupation. The record is devoid of any evidence suggesting that Saylor had any other job skills or training or that other jobs he would be able to perform were available.

Furthermore, section 391.41(b) of the Commercial Motor Vehicle Safety Guidelines prohibits a person who suffers from a mental disorder from driving a commercial vehicle if the disorder is "likely to interfere" with the person's ability to drive a vehicle in a safe manner. See 49 C.F.R. § 391.41(b)(9) (1999). Evidence presented during trial established that both Saylor's mental disorders and the medication used to treat those disorders are "likely to interfere" with his ability to drive a commercial vehicle. Although Saylor returned to work on January 7, 2000, he experienced instances during which his inability to concentrate made driving in a safe manner difficult. On June 1, 2000, a Department of Transportation Recertification Report was issued prohibiting Saylor from driving while taking Serzone, an antidepressant that had been prescribed to him by Dr. Arturi, his

treating psychiatrist at that time. Dr. Arturi also placed Saylor on medical leave on several occasions.

Saylor has not worked since July 14, 2001, when he ceased treatment with Dr. Arturi and began receiving treatment from Dr. McKnight. Saylor testified that he continues to suffer from anxiety attacks and depression and is unable to drive a truck or perform any other job. Moreover, at the time of Dr. McKnight's deposition, Saylor was taking Depakote ER to improve his sleeping and two antidepressants, Zoloft and Xanax. Due to this medication, Dr. McKnight restricted Saylor from working at any occupation.

Dr. McKnight testified that the medications also impair Saylor's ability to drive. Dr. McKnight explained, "I think . . . the dose of Xanax that he's taking that he would not be cleared through a drug test to drive his truck and if the police were to pull him over and require a blood test that they would consider that level of medication in his system intoxicating." Dr. McKnight opined that Saylor would be required to continue his current level of medication for an indefinite period of time and, as a result, would be unable to work at a competitive job.

Dr. McKnight also testified regarding Saylor's impairment rating. In assessing Saylor's permanent impairment, Dr. McKnight referred to the fifth edition of the American Medical Association Guidelines ("AMA Guides"). In this edition, impairments due to mental and behavioral disorder are rated from Class I to Class V with Class I constituting no impairment and Class V constituting extreme impairment. With regard to Saylor's ability to engage in the activities of daily living, Dr. McKnight rated Saylor as Class II or mildly impaired. Dr. McKnight rated Saylor as moderately impaired with regard to social function, concentration, and adaption but did not specify a class rating. Dr. McKnight further explained that the latest edition of the AMA Guides discourages physicians from assigning percentages of impairment for mental and behavioral disorders. He, therefore, referred to the second edition of the AMA Guides, which provided for the assignment of percentages for mental and behavioral disorders, and rated Saylor as 40% impaired to the body as a whole, which fell within the range of moderate impairment.

Lakeway contends that the trial court erred in failing to give greater weight to the deposition of Dr. Stephen Morgan, a neurologist and psychiatrist who conducted an independent medical examination of Saylor on June 5, 2000. Dr. Morgan relied upon the records of Dr. Richard Salamone, a neuropsychologist who concluded that Saylor had exaggerated many of his symptoms and behaviors. Dr. Morgan opined that Saylor experienced a "monophasic event" or "a single episode of depression/anxiety from which he made a gradual recovery back to a baseline . . . that's been stable over time." In explaining the term "baseline," Dr. Morgan stated that "everyone has a certain burden of worries, concerns and so forth and for some people it's greater than others. The question is, for a given individual, is that baseline deviated from a great extent during some type of episode." Dr. Morgan testified that he did not believe Saylor suffered permanent impairment or that any restrictions should be placed upon his work activities.

Dr. Morgan, however, examined Saylor on only one occasion in June of 2000. Dr. Arturi provided continuous treatment to Saylor for one and one-half years until Dr. McKnight began treating him in July of 2001. Although Dr. Arturi did not testify at trial, her medical records were entered as evidence and explained by Dr. McKnight during his deposition. At the time of Dr. McKnight's deposition, he had been treating Saylor on a continuous basis for approximately four months. Accordingly, we conclude that when assessing Saylor's vocational disability, the trial court did not err in refusing to give greater weight to Dr. Morgan's deposition testimony regarding his assessment of Saylor's condition after only one examination over Dr. McKnight's deposition testimony and the medical records of both Dr. Arturi and Dr. McKnight, the two treating psychiatrists.

In light of Saylor's age, education, limited job skills and training, the degree to which his condition and medication affected his ability to safely drive a commercial motor vehicle, and the extent and duration of his anatomical impairment, we hold that the evidence does not preponderate against the trial court's finding Saylor 100% permanently disabled with regard to his mental faculties.

## CONCLUSION

We conclude that the evidence and applicable law support the trial court's conclusions that Saylor suffered mental injuries that arose out of and occurred in the course of his employment with Lakeway and that Saylor was 100% permanently disabled with regard to his mental faculties. Accordingly, we affirm the trial court's judgment.

Costs of appeal are taxed to the appellant, Lakeway Trucking, Inc., and its surety, for which execution may issue if necessary.

_____
JANICE M. HOLDER, JUSTICE