IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 23, 2013

**IN RE MARY E. P. ET AL.**

**Appeal from the Juvenile Court for Maury County**
**No. 85888, 85889     George L. Lovell, Judge**

---

**No. M2013-00436-COA-R3-PT - Filed October 4, 2013**

---

The juvenile court terminated the parental rights of the mother and father on the grounds of substantial noncompliance with the permanency plans, persistence of conditions, and willful abandonment by failure to visit, and upon the determination that termination of their parental rights was in the best interests of the children. Both parents appeal. Finding the evidence clear and convincing, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the appellant, Christy P.[1]

Cara E. Lynn, Columbia, Tennessee, for the appellant, Mark P.

Robert E. Cooper, Attorney General and Reporter, Derek C. Jumper, Assistant Attorney General, James Stephens, and Mary Byrd Ferrara, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Charles M. Molder, Columbia, Tennessee, for the minor children, Mary E.P. and Melodie E.P.

---

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

Christie P. ("Mother") and Mark P. ("Father") are the parents of Mary (born September 2004) and Melodie (born June 2006). The Department of Children's Services ("the Department") and the community offered many services to the family beginning in September 2004 after Mother alleged she could not take care of Mary, due to "people bothering her."

The Department filed a Petition to Adjudicate Dependency and Neglect and for Court-Ordered Services on August 28, 2007, after an increasing number of referrals indicated that, *inter alia*, Mother was often found at Wal-Mart begging for food and diapers; on one occasion she asked strangers to take her children; law enforcement was dispatched to the home; reports indicated the home was filthy and the children were dirty and without food or diapers; the children's clothes and diapers were soiled, and Melodie often was not clothed. Mother, who suffers from paranoid schizophrenia, refused any treatment, and Father, who appears to be developmentally delayed, was rarely present at home and was seldom involved with the Department.

A preliminary hearing was held on August 31, 2007, and the Juvenile Court of Maury County ordered that legal and physical custody of the children shall remain with the parents, subject to the requirements of an agreed upon safety plan. The safety plan required the parents to take the children to Daisy Daniels Daycare, yet the parents failed to do this due in part to Mother's expressed paranoia of the daycare's religious beliefs. Mother stated she wanted to switch the children to Kids Country 3 located in Columbia, and the Department agreed; however, when the Department subsequently contacted Kids Country 3, it was informed that the family only brought Mary to daycare, they did not mention Melodie.

The parents were required to cooperate with the Department, but they failed to do so. On one occasion Mother scrunched down behind the couch and refused to answer the door. When the Department worker entered the home, Mother threw a bag of potato chips at the worker, began shouting profanities and referred to Child Protective Services as "the devil."

The safety plan also required Mother and Father not to take the children out in extreme hot or cold weather; however, on November 10, 2007, when the temperature was in the thirties, Mother walked from her home to the Columbia Wal-Mart with the children in a stroller wearing summer clothing. Mother contacted 911 and when the police officer arrived, Mother was trying to give the children's clothes to the Wal-Mart greeter, talked irrationally and disclosed she had not been taking her medication. The children were shivering in wet summer clothes; Mother stated they had an "accident," but would not elaborate. When a concerned citizen provided sweater jackets to the children, Mother became

perturbed and tried to give them back. Mother and children were transported to Maury Regional Medical Center where Dr. Daniels examined them. Dr. Daniels found Mother's erratic behavior was not a result of the Phenobarbital levels and was not related to her psychosis. Moreover, the nurse stated the children appeared to be in diapers from the night before. In response, Mother stated she only had two diapers left and that "Mary is grown up and doesn't need her anymore," although Mary was only three years old. The children appeared filthy and Mary's hair showed signs of head lice. Mother stated the only reason the Department keeps bothering her is because they accept referrals from "drugs addicts, prostitutes, and gay people." Father was contacted at work; he stated he could not come to the hospital until the afternoon.

The Department filed a Petition to Adjudicate Dependency and Neglect for Temporary Custody on November 14, 2007. The petition was supported by an Affidavit of Reasonable Efforts from Carrie Opalewski, Case Manager and CPS Investigator for the Maury County Office of the Department. The juvenile court found there was probable cause to believe the children were dependent and neglected, and a Protective Custody Order was approved and entered on the same date.

A preliminary hearing was held November 15, 2007, and the juvenile court again found there was probable cause to find the children were dependent and neglected, and ordered the children remain in the custody of the Department. Further, the court ordered the parents to pay child support in accordance with statutory guidelines; Mother and Father be provided with separate attorneys; and for the Department to setup visitation between the parents and children. An adjudicatory hearing was set for December 10, 2007, and on March 5, 2008, an Order Waiving Adjudicatory Hearing was entered.

The children were placed in foster care with a family in Spring Hill, Tennessee, and currently remain with them. The foster parents received the girls when Mary was three years and Melodie was 18 months old. Mr. M., the foster father, testified they immediately had big concerns with the girls. The children would hit their heads on the wall or floor, pull out their hair and self-stimulate. Testing showed the children were significantly delayed academically; Mary was diagnosed with attention deficit hyperactivity disorder (ADHD), predominately inattentive and anxiety disorder and not otherwise specified, and Melodie was diagnosed with mood deficit disorder not otherwise specified and ADHD, combined type.

The Department developed the first of many permanency plans on December 4, 2007, outlining several responsibilities and goals for the parents to regain custody of the children. The plans included, *inter alia*, the parents participate in psychological evaluations to ensure their mental health needs were met; participate in medication and psychiatric evaluations, and become compliant with medications if needed; participate in individual counseling and

individual counseling for parenting in order to become able to meet their children's needs; and to improve their parenting skills by participating in therapeutic visitation and family counseling.

In the interim, subsequent permanency plans were adopted in May 2008 through September 2010, and each one reiterated the requirements set forth in the initial plan, along with updated dates for completion of uncompleted tasks. Additional requirements added throughout the plans included, *inter alia*, Mother and Father maintain stable and appropriate housing and means of support for the family; focus on the children's problems rather than their own; participate in children's speech services, counseling appointments, educational meetings, and other services for the children; and be able to demonstrate age appropriate discipline and communication with the children. Throughout this period, the Department provided a variety of services to assist the parents in meeting their obligations under the permanency plans and remedying the conditions that resulted in foster care, which services will be addressed in detail later in this opinion.

Due to the parent's failure to cooperate, the Department filed a motion to suspend Mother and Father's visitation. The juvenile court granted the motion on January 25, 2012.

After making the determination that Mother and Father were not complying with the permanency plans and the conditions that existed when the children were taken into custody in 2007 persisted, on February 24, 2012, the Department filed a Petition to Terminate Parental Rights on the grounds of abandonment for failure to visit and failure to support, substantial noncompliance with permanency plans, persistence of conditions, and mental incompetence of Mother.

The petition to terminate Mother and Father's parental rights was set for trial in the Juvenile Court of Maury County on December 7, 2012. Despite notice of the proceeding, Mother and Father failed to appear for the first day of trial; however, their respective attorneys were in attendance. The court was informed that Mother was having blood work drawn the day of trial; however, the doctor's office was less than an hour away and there was no appointment scheduled, but that the blood work had to be drawn before four in the afternoon. Father did not attend due to work. The court determined there was insufficient justification to continue the proceeding based upon the parents' failure to appear at the time of trial, and the case was previously docketed with the consent of all parties.

At the conclusion of the first day of trial, the case was set to continue on December 11; both parents appeared and participated in the second day of trial. The court heard testimony from numerous witnesses including Father; Pam Arnell, therapeutic family counselor and owner of Arnell's Counseling; Allison Clanton, child and family therapist; Mr.

M., the children's foster father; Meredith Worsham and Moon Unanorworv, Department family service workers; Holly Wunner, a Department resource parent support worker, formerly a Department family service worker; Marsha Boren, director of the CASA program in Maury County who has been involved with the case in its entirety; Elysse Beasley, a therapist who evaluated Mother in November 2011. Mother was in attendance but did not testify.[2]

The juvenile court entered an Order Terminating Parental Rights and Granting Full Guardianship on January 8, 2013, finding the Department had proven three grounds by clear and convincing evidence: the grounds of substantial noncompliance with the permanency plans, persistence of conditions, and abandonment due to failure to visit. The court also found termination of Mother and Father's parental rights was in the best interests of the children. Accordingly, Mother and Father's parental rights were terminated.

Mother and Father filed a timely appeal and both parents present the same four issues for our review: whether the trial court erred in finding three grounds for termination of their parental rights under Tennessee Code Annotated § § 36-1-13(g)(1) - (g)(3) and whether termination of parental rights is in the best interests of the children.

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). The petitioner has the burden of proving that one statutory ground for termination exists. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). In addition to proving one ground for termination, the petitioner must prove that termination of parental rights is in the child(ren)'s best interest(s). Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing

---

[2]At the close of proof, the Department notified the court that it was voluntarily withdrawing the ground of failure to support.

evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proven by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546.

Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

**ANALYSIS**

### I. PERMANENCY PLAN AND THE DEPARTMENT'S EFFORTS

This is not a case where reasonable efforts are excused;[3] therefore, we must first determine whether the terms and goals of the permanency plans were reasonable and related to remedying the conditions which necessitated removal of the children and whether the Department exerted reasonable efforts to assist Mother and Father to achieve the goals and to be reunited with their children before examining the grounds at issue.

"Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). The Department's first obligation in this regard is to establish permanency plans, the terms of which are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This statutory policy does not require that the Department's effort to reunify the family be "herculean"; nevertheless, the Department's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

---

[3]The Department is not required to make reasonable efforts every time it removes a child. In certain aggravated circumstances, such as severe child abuse, the Department is relieved of this duty. Tenn. Code Ann. § 37-1-166(g)(4); Tenn. Code Ann. § 36-1-113(g)(7).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *S.M.D.*, 200 S.W.3d at 198.

## A.  PERMANENCY PLAN

The children were removed from the parents' custody due to the conditions in the home, Mother's untreated mental health condition that prevented her from safely caring for the children, Mother and Father's inability to provide for the children, inability to ensure the children's medical and mental health needs were met appropriately and non-compliance with the court ordered safety plan. Because of the above concerns, the Department developed permanency plans with goals to ensure the children's safety, and for the parents to address their issues, including: parenting skills, mental health of Mother, counseling and medication management for Mother, maintaining stable residence and source of income, and therapeutic visitations between the parents and children.

We have concluded the above requirements and goals identified in the permanency plans were reasonable and related to remedying the conditions which necessitated the removal of the children from Mother and Father's care and the resulting foster care placement. Accordingly, the plans satisfied the requisite criteria. *See In re Valentine*, 79 S.W.3d at 547; *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C).

## B. REASONABLE EFFORTS

Prior to the children entering the Department's custody in November 2007, the family was provided with several services from the Department and other community service providers since September 2004. Mother refused or would not cooperate with the various mental health treatment services offered, which included, therapy and psychiatric services for paranoia, and services from Centerstone and the Family Center. The parents were also provided services from Nurses to Newborns, the Caring Hearts program and Family Support Services, but failed to cooperate. Maury United Ministries transportation (MUMs) was an option for Mother; however, she abused the privilege and lost the service. In regards to the Department's efforts to help satisfy the requirements of the court ordered safety plan, they attempted to monitor Mother's mental health treatment, provided daycare services, counseling and therapeutic visitation opportunities.

The Department continued many of the same services in efforts to help Mother and Father achieve the permanency plan goals. The Department attempted to assist Mother with her mental health requirements, which is the biggest barrier to returning the children to their parents, by making efforts to monitor Mother's mental health treatment; however, Mother would not sign a release to obtain these records. Further, the Department arranged and paid for family counseling with Allison Clanton, but these visits had to be discontinued due to Mother's disruptive behavior. The Department also arranged for therapeutic visitation opportunities for both parents with Arnell's Counseling, but the parents routinely missed visits, cancelled visits, or simply did not appear.

As for the children's needs, the Department provided foster care placement in Spring Hill, Tennessee, where they remain. To help with the children's emotional and mental health needs, Ms. Clanton provided individual therapy to each of the girls, family therapy to the children with their foster parents, collateral therapy with only the biological parents, and provided collateral therapy with only the foster parents.

Considering the above facts and other relevant evidence we have not yet addressed, we have determined the Department exerted reasonable efforts to assist Mother and Father to achieve the stated goals.

We now turn our attention to the statutory grounds at issue: substantial noncompliance with the permanency plans, persistence of conditions, and abandonment by failure to visit the children, to determine whether the evidence clearly and convincingly establishes one or more of these grounds.

## II. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

### A. SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLANS

Noncompliance with the permanency plan is a statutory ground for termination of a parent's rights. Tenn. Code Ann. § 36-1-113(g)(2). For noncompliance to justify the termination of parental rights, it must be "substantial" noncompliance. *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 546.

The first permanency plan was adopted on December 4, 2007. Pursuant to the first and subsequent plans, the goals of which remained consistent, Mother was to address her mental health needs with counseling and medication, the parents were to maintain stable residence, focus on the children's problems rather than their own, attend counseling to improve their parenting skills, and attend therapeutic visitations with the children. Mother and Father accomplished none of the these goals.

Meredith Worsham worked with the family from November 2009 until May 2011. She helped draft permanency plans for the family and stated the goals for the parents had not substantially changed during her time on the case. She testified both parents were substantially non-compliant for a number of reasons: Mother's primary goal was to address her mental health issues; however, Mother did not attend counseling and, despite repeated requests from the Department, repeatedly refused to sign a medical release; the parents were not consistent with visitation or attending school meetings for the children; Father did not have stable employment, and their income was not enough to meet the needs of the family; and when asked specifically about Father, Ms. Worsham stated "[he] is not ensuring the girls' safety" by leaving them alone with their mother.

Child-family therapist, Allison Clanton, spent more than two years working with the family. She provided individual therapy to the girls, family therapy to the children with their foster parents, collateral therapy with only the biological parents, and provided collateral therapy with only the foster parents. Ms. Clanton stated she was forced to ask Mother to leave and cut Father's session short, due to Mother being disruptive, disrespectful and behaving in an extremely erratic manner. Mother refused to return and complete the session, and Father did not return either. Ms. Clanton's opinion is that while Father does not show serious deficits in providing structure, he prioritizes structuring for Mother over his children, and that creates a severe deficit.

Pam Arnell, therapeutic family counselor and owner of Arnell's Counseling, began working with the parents in September 2011 with the goals of teaching them parenting skills, providing them with therapeutic visitation and help with bonding during visitation. The parents were required to travel from Mt. Pleasant to the Publix in Spring Hill to pick up the children for visitations; however, Ms. Arnell testified the parents routinely missed visits, cancelled visits, or simply did not appear, even though the parents scheduled the visits. Mother and Father gave various reasons for their absences, including sleeping late, medical appointments, illness and not having the money for gas. The Department provided a gas-card for the family but receipts were not returned, as directed by the Department, but due to the parents' noncompliance with this requirement, the case manger was unable to provide further financial assistance. The Department authorized 32 hours of visitation during September 2011, Mother and Father only used 6 of those hours to visit the children; 28 hours were authorized for October, and only 12 were used; 6 hours were authorized for November, and only 1 was used; 21 hours were authorized in December and only 2 hours and 45 minutes were used.

When the parents did attend visitation, Ms. Arnell stated Father was more active and responsive with the children than Mother, and that Mother spent more time complaining about the Department. During one visit, Mother slung a tub of pretzels at Ms. Arnell; the container and pretzels hit Ms. Arnell and the children. When asked if Mother could safely care for the children, Ms. Arnell testified she would have concerns for the children's safety, their emotional needs being met, their academia being achieved and medical needs being met if Mother was to have them on her own. When asked the same question about Father, Ms. Arnell stated that if he did not have to care for Mother and could spend as much energy on the children in learning what was appropriate, "I think it would be better compared to the current situation of both of them being together." Father admitted as much when he told Ms. Arnell that he recognized it would be easier, "but I can't divorce her." Ms. Arnell closed the case in November 2011 due to the parents' non-compliance and Mother's threats against Ms. Arnell.

Father acknowledged the goals of the parenting plans remained consistent and that some of the goals had not been met. He admitted to having at least six different jobs since 2007, and at certain points was not making enough money to make child support payments. He testified that Mother and he had lived in at least seven different residencies since the girls came into the Department's custody and that he refused to advise the Department when they changed addresses, even though he was aware he was required to do so. When asked about Mother, he conceded that he realizes others have concerns with her mental condition, but stated he does not have any such concerns.

The foregoing, and other evidence in the record, clearly and convincingly established Mother and Father were in substantial noncompliance with the permanency plans. Therefore, we affirm the trial court's finding that the parents failed to substantially comply with the requirements of the permanency plan.

## B. PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;
> > (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and
> > (C)  The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

*Id.*

Marsha Boren, Director of the CASA program in Maury County, has been on the case for its entirety, more than five years at the time of trial. According to Ms. Boren, not a single issue that brought the children to custody has been resolved. Persistent issues include: Mother's mental health issues and her lack of compliance with treatment, her refusal to work with service providers, her limited parenting skills, lack of ability to focus on the children's needs over her own, and Father's inability to meet the needs of the family. She stated she never questioned the parent's love for the children, but "the question is in their ability to provide for them and care for them appropriately."

Therapist Elysse Beasley evaluated Mother in November 2011. When speaking of Mother's parenting ability, Ms. Beasley stated "attending to the needs, keeping them safe, protecting them, I felt that her touch with reality was such that would be very difficult for her

to do, if not impossible." Ms. Beasley also stated that "I do not believe that she has the capability at this time, and not likely to have it in the future either," and that Mother does not have the ability to function as a parent.

For Father's part, he repeatedly refused to accept the fact Mother has a serious mental illness that requires medical attention. Father also refused to acknowledge that Mother poses a risk to the children if left alone, and has refused to terminate his relationship with Mother. *See In re Eric J.P.*, M2012-02082-COA- R3-PT, 2013 WL 1788547, at *4 (Tenn. Ct. App. Apr. 24, 2013) (Wherein the court terminated the mother's parental rights due, in part, to the fact the mother would not end her relationship with the father, and refused to accept the fact he sexually abused her daughter, and that he posed a similar risk to the other children).

The evidence in this record, which we summarized earlier, clearly and convincingly established that Mother and Father made no material changes to the conditions that existed when the children were removed in 2007, there is little likelihood that these conditions will be remedied at an early date so that the children may be safely returned to the parents in the near future, and the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. For these reasons, we affirm the trial court's finding that the Department proved the "persistent conditions" ground for termination of Mother and Father's parental rights by clear and convincing evidence, pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

C. ABANDONMENT BY FAILURE TO VISIT

Tennessee Code Annotated § 36-1-113(g)(1) provides that parental rights may be terminated based upon the ground of abandonment for willfully failing to visit the child. This form of abandonment is defined as when a parent "willfully failed to visit . . . the child for the period of four consecutive months preceding the filing of the petition to terminate that parent's rights." Tenn. Code Ann. § 36-1-102(1)(A)(i).

Failure to visit a child is "willful" when a parent is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). However, where the failure to visit is *not* willful, a failure to visit a child for four months does not constitute abandonment. *R.G.W. v. S.M.*, No. M2009-01153-COA-R3-PT, 2009 WL 4801686, at *8 (Tenn. Ct. App. Dec.14, 2009) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). "A parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *Id.*

-12-

Tennessee Code Annotated § 36-1-102(1)(E) states that, "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." "[T]oken visitation," is visitation, which "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

We have reviewed the record and find the evidence clearly and convincingly supports the conclusion that Mother and Father only engaged in token visitation during the relevant period and the visitation did not produce a meaningful visit to establish a meaningful relationship or bond between the parents and the children. Thus, the parents willfully failed to visit the children for the determinative four months. *See* Tennessee Code Annotated § 36-1-102(1)(C) and (E).

We, therefore, affirm the trial court's ruling that Mother and Father abandoned the children by failing to visit the children as defined in Tennessee Code Annotated § 36–1–102(1)(A)(i).

## II. BEST INTERESTS OF THE CHILDREN

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interests analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

Allison Clanton, the children's therapist, testified the children's Global Assessment of Functioning (GAF)[4] scores had improved since they entered foster care. She described GAF as "a 0 to 100 scale that gives other clinicians or physicians an idea of how impairing . . . the diagnosis is." Mary initially scored a 55 and Melodie a 50, which indicates "serious

---

[4]The GAF ranks mental functioning on a scale of 0-100, with the range of 0 to 30 being catatonic or near death and the score of 90 or greater being manic . . . [and an] average range of 60-70. *Ivey v. Trans Global Gas & Oil*, 3 S.W.3d 441, 447 n.12 (Tenn. 1999).

to moderate symptoms." Mary's score improved to 67 and Melodie's to 65, which Ms. Clanton explained indicates improvement but "some mild symptoms" remain. Ms. Clanton stated the relationship dynamics were significantly different when comparing the attachment assessment of the girls with their biological parents compared to their foster parents. Ms. Clanton stated she is concerned Mother could become so agitated she might accidently harm the children "because she does become very physically agitated." However, when speaking of the foster parents, Ms. Clanton feels they are "the strongest factor for the girls' improvement."

Ms. Clanton said the children have clearly come to love and trust the foster parents; they have made progress academically, emotionally, behaviorally, and physically, and that she would be concerned the progress would be reversed if they were returned to their Mother and Father. She testified the foster parents showed great skill in nurturing the children, and if they were removed, "they're likely to experience grief and loss issues." Mr. M, the children's foster father, testified the girls have developed a strong bond with their biological child, and that he and his wife love Mary and Melodie, and if given the opportunity, would adopt the children.

In this case, the evidence clearly and convincingly established that Mother and Father failed to make an adjustment in circumstance to provide a safe and stable home for the children. *See* Tenn. Code Ann. § 36-1-113(i)(1). Further, to allow the children to return to the parents would subject the children to more uncertainty and instability. Moreover, it would require the removal of the children from environments where their conditions have dramatically improved and they are much happier and healthier. *Id.* § 36-1-113(i)(5).

Considering these relevant factors from the children's perspective, the evidence clearly and convincingly established that it is in the children's best interests that Mother and Father's parental rights be terminated.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the parents/appellants.

_____
FRANK G. CLEMENT, JR., JUDGE

-14-