FILED

August 25, 2015

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time: 11:06 AM



# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| Joseph Kolby Willis, | ) | Docket No.: 2014-05-0005 |
|    Employee, | ) | |
| v. | ) | State File No.: 57982-2014 |
| All Staff, | ) | |
|    Employer, | ) | Date of Injury: July 30, 2014 |
| And | ) | |
| Riverport Insurance Co., | ) | Judge: Baker |
|    Insurance Carrier. | ) | |
| | ) | |

## COMPENSATION HEARING ORDER IN A BIFURCATED PROCEEDING

THIS CAUSE came before the undersigned Workers' Compensation Judge on July 20, 2015, pursuant to Tennessee Code Annotated section 50-6-239 (2014) for a Compensation Hearing. The employee, Joseph Willis, seeks a determination regarding whether the employer, All Staff, is obligated to provide temporary disability and medical benefits. Considering the parties' positions, the applicable law, Mr. Willis' testimony, and all the evidence submitted, this Court finds that Mr. Willis sustained a compensable injury and is entitled to temporary disability and medical benefits. As these proceedings have been bifurcated, the Court reserves the issue of permanency pending further litigation.

## ANALYSIS

### Issues

1. Whether Mr. Willis suffered an injury arising primarily out of and in the course and scope of his employment for All Staff.

2. If so, whether All Staff must provide him temporary disability and medical benefits.[1]

---

[1] The Court bifurcated the proceedings in this case because Mr. Willis received limited medical treatment for his injury and he had not reached maximum medical improvement. Thus, if Mr. Willis prevailed at this proceeding by proving his injury compensable, the Court would consider the amount of any permanent disability benefits due at a

1

## Evidence Submitted

The Court admitted into evidence the exhibits below:

1. Curriculum vitae of Dr. David Moore;
2. Office notes of Dr. Moore;
3. October 28, 2013 letter of Dr. Moore;
4. Treatise on the lower limb;
5. Medical records of Dr. David Moore;
6. August 14, 2014 workplace restrictions provided by Dr. Moore;
7. August 8, 2014 radiology report;
8. May 22, 2015 transcript of Dr. Moore deposition;[2]
9. August 21, 2014 Dr. Moore letter; and
10. Medical bills.

The Court designated the following as the technical record:

- Petition for Benefit Determination (PBD), filed August 13, 2014;
- Dispute Certification Notice (DCN), filed September 18, 2014;
- Joint Pre-Compensation Hearing Statement;
- All Staff's Motion in Limine;
- Mr. Willis's response to All Staff's Motion in Limine;
- Deposition Notice for Mr. Willis, filed April 28, 2015;
- Deposition Notice for Mr. Willis, filed May 6, 2015; and
- Deposition Notice for Dr. David Moore, filed April 28, 2015.

The Court did not consider attachments to the above filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in the above filings or any attachments to them as allegations unless established by the evidence.

The parties stipulated to the following:

- Mr. Willis is a twenty-three-year-old resident of Lewis County, Tennessee.
- Mr. Willis suffered an injury on July 30, 2014.
- Mr. Willis worked for All Staff at the time the injury occurred.
- Mr. Willis has a high-school diploma.

---

subsequent hearing upon his attainment of maximum medical improvement.

[2] There was some confusion about numbering the exhibits at trial. To ensure that all exhibits were properly admitted, the exhibits attached to the deposition were admitted with the deposition, even though the Court admitted duplicate copies of some of the exhibits separately.

- Following the injury, Mr. Willis did not return to work for All Staff earning the same or greater wages.
- Mr. Willis earned an average weekly wage of $428.87 at the time of the injury, resulting in a compensation rate of $285.93.

At the Compensation Hearing, Mr. Willis provided in-person testimony. No other witnesses testified.

## History of Claim

### *Procedural History*

Mr. Willis filed a PBD on August 13, 2014. The parties did not resolve the disputed issues through mediation, and the Mediation Specialist filed the DCN on September 18, 2014. Mr. Willis filed a Request for Expedited Hearing seeking temporary disability and medical benefits. Mr. Willis requested a record review but did not include an affidavit, deposition or any sworn testimony with his request. This Court entered an order denying Mr. Willis' Request for Expedited Hearing on November 10, 2014, and deemed the claim non-compensable. The parties then proceeded to discovery and this compensation hearing.

### *Factual Background and Testimonial Evidence*

Mr. Willis worked for All Staff, a staffing company, as a "line helper" at the Milliken/Kasbar textile plant (Kasbar) in Columbia, Tennessee. His job duties included loading the "hoppers" with material to keep the assembly line moving and loading finished rolls of textile into trucks. Although the factory had not licensed Mr. Willis to drive a forklift, his supervisor allowed him to drive a forklift to move materials.

Mr. Willis' job required him to recycle scrap material. To perform his recycling duties, Mr. Willis used the forklift to transfer the scrap a distance of approximately fifty feet from the scrap pile to a baling machine, a device similar to an industrial trash compactor. After filling the loading area of the baler completely, Mr. Willis flipped a switch on the back of the machine to turn the machine off. He then proceeded back to the front of the machine, where he placed pieces of baling wire into the machine, so that they traversed the machine on the inside and the ends of the wire pieces protruded from the back. Thereafter, he walked behind the machine and tied the ends of the baling wire together at several points to secure the scrap into a bale. Mr. Willis had to "squat down" in order to reach the tie-points on the machine with the bottommost tie-point being about one foot off the ground. Additionally, Mr. Willis had limited space behind the baling machine—at trial, he described an area of approximately two and one-half to three feet in width between the back of the baling machine and a nearby guardrail—to maneuver while tying the baling wire. After tying the baling wire at each tie-point, a process which

3

took several minutes, Mr. Willis turned the power back on, pushed the start button and the machine formed the material into a large bale of scrap material. Mr. Willis then used a forklift to transport, weigh, and store the bale.

About two weeks before he suffered the workplace injury, Mr. Willis' supervisor told him that he could no longer drive the forklift to move materials. Without access to the forklift, Mr. Willis resorted to "rolling" or pulling the scrap material across the factory floor to the baling machine. Mr. Willis testified that he had little trouble rolling the small rolls, which weighed between eighty and 120 pounds. The larger rolls, however, proved more difficult.

On July 30, 2014, Mr. Willis suffered an injury to his left knee while working the third shift at Kasbar. Mr. Willis' shift started at 11:00 p.m. Over the course of the shift, he carried scrap to the baling machine and produced two or three bales of scrap. At that time, Mr. Willis testified, the area around his upper left thigh, right above his knee, had hurt for about a week. He further testified that he had sharp pains, and an occasional burning pain, in the area around his left knee. Mr. Willis did not know the cause of the pain, and testified that he had no trouble with his knee following a prior surgery to correct his left knee after his kneecap popped out of place several years earlier.

Mr. Willis' supervisor expected him to produce four bales of scrap per shift. Around 3:00 a.m., Mr. Willis finished loading the baler and moved to the backside of the machine to tie the baling wire in order to produce another bale. He finished tying the bottommost tie and moved to rise from a squatting position. Mr. Willis demonstrated twisting as he rose from the squatting position, and testified that he intended to use his left arm to power up the baling machine. By using his left arm, Mr. Willis had to reach across his body. When he attempted to rise, but before coming up from the squatting position completely, he "felt a sharp, quick pain in my knee and I immediately fell down to the ground grabbing my leg. I looked down; I saw my kneecap was out of place."

Mr. Willis testified that his left kneecap shifted completely to the right so that it was located on the inside of his left leg. He "popped" his knee back into place and then "scooted" on his back from behind the machine and signaled coworkers to come to his aid. The coworkers helped Mr. Willis outside to the parking lot, and his supervisor drove him to the Maury Regional Medical Center emergency room (Maury Regional).

Providers at Maury Regional x-rayed Mr. Willis' left knee and confirmed that his kneecap had popped out of place. (Ex. 7.) The providers at Maury Regional prescribed pain medication and a knee immobilizer and released Mr. Willis that same day. After his release from the hospital, Mr. Willis testified that All Staff reprimanded him for failing to report his injury immediately.

After his release from the hospital, Mr. Willis saw Dr. David Moore, who

4

performed an arthroscopic patellar realignment and chondroplasty on Mr. Willis' knees in 2005 and 2006. (Exs. 2, 3, 5.)[3] Dr. Moore also examined Mr. Willis on August 29, 2013, when Mr. Willis sought medical clearance to join the United States Navy. (Ex. 2.) Mr. Willis did not express having any problems with his knees during the appointment, and the examination revealed "normal alignment, normal motion, and normal stability" in both knees. *Id.* Dr. Moore cleared Mr. Willis for military service. (Exs. 3, 5.)

In August 2014, Dr. Moore ordered an MRI, which revealed that Mr. Willis dislocated his kneecap and "tore the remainder of his previously repaired medial patellofemoral ligament." (Ex. 8 at 16.) On August 14, 2014, Dr. Moore cleared Mr. Willis to return to work but imposed workplace restrictions that prohibited him from squatting, stooping, bending and working at unprotected heights. (Ex. 6.) Dr. Moore recommended additional therapy, but Mr. Willis could not attend because he did not have health insurance. He scheduled Mr. Willis for a follow-up appointment on September 18, 2014. *Id.*

With respect to medical bills, Mr. Willis testified that he paid half of the MRI bill, which was "around $250," and half of the bill for the office visits with Dr. Moore, which was "around $150," but he did not know the exact amount. Dr. Moore billed a total of $2,910 to Mr. Willis for care provided for the left-knee injury. (Ex. 10.)

Mr. Willis provided the restrictions to All Staff, but All Staff could not accommodate his restrictions. He testified that he looked for work thereafter, but his "knee was getting in the way of it," and he was unable to find a job until May 2015, when he began working for Tanner Coating Pipeline Services. His new job required him to do heavy work, including kneeling, bending, and squatting.

Concerning the current condition of his knee, Mr. Willis testified that his knee was "fine," and it was "where he could work on it, where he could walk around on it." However, he still experienced random, sharp pains in his knee one or twice a week and a little instability. The pain began both during work and after work when he lay down to rest. Mr. Willis wished to return to Dr. Moore for treatment.

On cross-examination, Mr. Willis admitted that he was not lifting anything at the time the injury occurred, and that the floor behind the baling machine was level and free of hazards. Additionally, Mr. Willis admitted that he did not indicate on a recent employment application that he previously suffered an injury that impaired his lifting capacity. When asked why he did not include the information on his application, he stated, "They just basically told me, they said, can you lift heavy stuff, I said yeah, they

---

[3] At trial, Mr. Willis testified that he had no problems with his knees, other than occasional soreness, following the surgery and was able to run, work out and play sports without difficulty.

5

said well you're fine, you don't have to put that."[4]

Mr. Willis took Dr. Moore's deposition on May 22, 2015. During the deposition, the following exchange occurred between Dr. Moore and Mr. Willis' attorney, Gene Hallworth:

Q:      Did you get a case history?

A:      I did. I took his history at that time.

Q:      And what was that history?

A:      He did tell me that at time that [sic] he had actually been doing quite well until he sustained an injury while at work. And he was basically coming out of a squatting position. It sounds as if he were twisting when he came up and he felt that his kneecap came out of place.

Q:      Okay. And assume, if you would, that he was working, pulling material on a – on a floor that weighed anywhere between 100 pounds and 3 or 400 pounds or more and that his knee was fatigued at the time of this injury. Would that have an effect on this injury?

A:      If someone had done a significant amount of exertion in their quadriceps, in particular work fatigue, that's what controls your kneecap, so you would have less control of your kneecap. So, yes, that is possible.

Q:      Well, is it more likely – if the history is true, would it be more likely than not – or cause – I mean, a contributing factor?

A:      I would say it's a contributing factor. I guess I would have to know how much he lifted. How tired he was. I mean, there are a lot of different permutations. But it is certainly possible that if he did have significantly fatigued quadriceps that that would have given him less control over his kneecap.

Q:      Okay. So it's fair to say that if he does a lot of exertion on his knee immediately prior to this injury that that physical exertion, more likely than not, did contribute to this injury? Is that fair?

A:      If he was significantly fatigued, I would say that, yes, that would have helped contribute to his injury.

---

[4] The Court understands "they" to mean Mr. Willis' potential employer.

Q: Okay. And assume that he was in a squatting position behind a machine that's one or two feet from a wall behind; and then there is a rail behind that safety rail between him; making it a fairly tight place for him to be squatting, and he would be in an awkward position with his knees. Would that be a contributing factor or could it be a contributing factor?

A: Certainly, the position of his – when people tend to dislocate or sublux, meaning having the patella come part way out and go back in, or dislocate and come all the way out of place, it's usually the position of their knee. So it's usually flexed, meaning significantly bent. And then there's a significant valgus force, meaning that their knee is turned relative to their ankle. So anything that would put him in that position would certainly lead to an increased risk of a patella dislocation.

(Ex. 8 at 8-10.)

On cross-examination, All Staff's attorney, Duane Willis, asked Dr. Moore whether Mr. Willis could have suffered the same injury if he performed a similar movement outside the work environment. Dr. Moore stated, "I guess that is a fair statement. I mean, I think it is his – if he would have performed that same maneuver in another location, not at work, could it have come out of place? The answer to that would be yes." (Ex. 8 at 24.) On re-direct, near the conclusion of the deposition, Mr. Willis' attorney and Dr. Moore stated the following:

Q: All right. And then the fact that he was in a tight area between the wall and the bailing [sic] machine, which is a fairly large machine, that being in an awkward position turning his leg would be a contributing factor?

A: Being in a tight space, squatting down, I think would actually make you more prone to having to rotate your body as you go from a squatting position. So if that were the case that is also a possible contributing factor.

Q: Well, I don't like the word "possible," Doctor, because anything is possible. So would it be more likely – assuming those are the facts, would it be more likely that not? And then if he is reaching over his head to a button to try to turn a machine on or off, would that –

Mr. Willis: Objection.

A: Again, that is really hard for me to actually answer correctly not knowing exactly what it looks like and how big the space is relative to his

7

body. I mean, if he were in a cramped space where he had to contort and rotate as he is getting up, could that lead to an increased risk for his patella to come out of place? It could.

(Ex. 8 at 26-27.)

## Mr. Willis' Contentions

Mr. Willis argues that he suffered a compensable knee injury on July 30, 2014. He argues that the size of the area behind the baling machine, coupled with the unusual position in which he had to maneuver his body to tie baling wire and operate the machine, constituted a hazard of employment that contributed more than fifty percent in causing his injury. He requests that the claim be deemed compensable and that All Staff be ordered to provide him temporary disability and medical benefits.

## All Staff's Contentions

All Staff argues that the work did not contribute more than fifty percent in causing Mr. Willis' injury. Mr. Willis did not testify that a special hazard contributed to the injury, or that he lifted material. Dr. Moore stated that Mr. Willis could have suffered the same injury at any other location. In short, simple body mechanics and Mr. Willis' pre-existing knee condition resulted in the injury. All Staff argues that the Court deemed the injury non-compensable in its order denying Mr. Willis' request for relief on an expedited basis and should not reverse course now. It asks that the Court find the claim non-compensable.

## Findings of Fact and Conclusions of Law

### *Standard Applied*

The Workers' Compensation Law shall not be remedially or liberally construed in favor of either party but shall be construed fairly, impartially and in accordance with basic principles of statutory construction favoring neither the employee nor employer. Tenn. Code Ann. § 50-6-116 (2014). In a workers' compensation action, Employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2014). Employee must show that the injury arose primarily out of and in the course and scope of employment. Tenn. Code Ann. § 50-6-102(13) (2014).

### *Factual Findings*

Mr. Willis had surgery to repair both of his kneecaps due to instability, which previously caused dislocations. He underwent surgery in 2005 and 2006, and had no

8

problems with his knees since the surgeries, other than occasional pain. On July 29, 2014, Mr. Willis started his shift at Kasbar at 11:00 p.m. He moved rolls of scrap material, weighing at least eighty to 120 pounds, from the line to the baling machine over the course of the next five hours and produced two or three rolls of scrap material. The baling machine was situated in such a manner that Mr. Willis had only two and one-half to three feet of space behind it to maneuver while tying the baling wire pieces into knots. The small amount of space required Mr. Willis to position his body awkwardly. At approximately 3:00 a.m., Mr. Willis squatted down, in an awkward position, to tie the last baling wire at the tie point located approximately one foot above the factory floor. When Mr. Willis moved to rise, he twisted his body, and his left kneecap dislocated. Dr. Moore determined that the dislocation tore the previously repaired medial patellofemoral ligament in Mr. Willis' left knee. Dr. Moore recommended therapy, knee immobilization, and surgery if the therapy and immobilization did not stabilize Mr. Willis' knee.

*Application of Law to Facts*

## I.      **All Staff's Motion In Limine**

All Staff asks the Court to bar the introduction of Dr. Moore's deposition as an exhibit at trial. In the alternative, All Staff asks that the Court prohibit introduction of Dr. Moore's testimony concerning temporary total disability, permanent partial and permanent total disability, maximum medical improvement and past medical expenses. As grounds for the motion, All Staff argues that Mr. Willis prejudiced its client by failing to update its discovery responses in a timely manner. Specifically, All Staff claims that Mr. Willis did not provide it a complete copy of Dr. Moore's treatment records until the day of the deposition. All Staff argues that Mr. Willis's failure to provide the records violated Rule 26.05 of the Tennessee Rules of Civil Procedure, and inhibited its ability to take an effective deposition.

Mr. Willis opposes the motion arguing, essentially, that All Staff prejudiced itself by scheduling the deposition without having reviewed all the medical records. The Court agrees.

The file shows that All Staff noticed Dr. Moore's deposition for May 22, 2015. The Court finds that All Staff noticed the deposition with the suspicion that it likely did not have all the medical records and, in fact, admitted this suspicion in its motion. Furthermore, counsel for Mr. Willis denies that All Staff asked for updated records and thought that All Staff had already acquired them. All Staff had the option to reschedule the deposition if it needed more time to review the records and could have mitigated the alleged prejudice by rescheduling. Instead, All Staff chose to go forward with the deposition. For that reason, the Court finds that Mr. Willis' alleged failure to update his discovery responses was harmless, or All Staff could have mitigated the alleged harm. In

9

any event, the Court holds that the alleged failure does not warrant barring the introduction of any portion of Dr. Moore's deposition. The Court denies All Staff's motion in limine.

## II.    Compensability

In order for an injury to be compensable, it must have been accidental. Under the Tennessee Workers' Compensation Law, an injury is accidental "only if the injury is caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence[.]" Tenn. Code Ann. § 50-6-102(13)(A) (2014). "An injury 'arises primarily out of and in the course and scope of employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes[.]" Tenn. Code Ann. § 50-6-102(13)(B) (2014). The statutory requirements that an injury arise out of and in the course of the employment are not synonymous "although both elements exist to ensure a work connection to the injury for which the employee seeks benefits." *Blankenship v. Am. Ordnance*, 164 S.W.3d 350, 354 (Tenn. 2005).[5]

An injury occurs in the course of employment if it takes place while the employee performs a duty he or she is employed to perform. *Fink v. Caudle*, 856 S.W.2d 952, 958 (Tenn. 1993). Thus, the "course of employment" requirement focuses on the time, place, and circumstances of the injury. *Saylor v. Lakeway Trucking, Inc.*, 181 S.W.3d 314, 318 (Tenn. 2005).

Mr. Willis' injury constituted an injury by accident and undoubtedly occurred in the course of his employment for All Staff. Mr. Willis' left kneecap dislocated during his shift at Kasbar at approximately 3:00 a.m. on July 30, 2015, when he turned to rise after tying baling wire to secure the scrap bale produced by the baling machine. His job required him to perform this action. The main point of contention, however, is whether Mr. Willis' injury arose primarily out of his employment.

"Arising out of employment" refers to causation. *Reeser v. Yellow Freight Sys.*, 938 S.W.2d 690, 692 (Tenn. 1997). An injury arises out of employment when there is a causal connection between the resulting injury and the conditions under which the work is required to be performed. *Fritts v. Safety Nat'l Cas. Corp.*, 163 S.W.3d 673, 678 (Tenn. 2005). Stated another way, an injury arises out of employment when it "has a

---

[5] The Tennessee Workers' Compensation Appeals Board allows reliance on precedent from the Tennessee Supreme Court "unless it is evident that the Supreme Court's decision or rationale relied on a remedial interpretation of pre-July 1, 2014 statutes, that it relied on specific statutory language no longer contained in the Workers' Compensation Law, and/or that it relied on an analysis that has since been addressed by the general assembly through statutory amendments." *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, *13 n.4 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015).

rational, causal connection to the work." *Braden v. Sears, Roebuck & Co.,* 833 S.W.2d 496, 498 (Tenn. 1992). "The mere presence of an employee at the place of injury because of his [or her] employment will not alone result in the injury being considered as arising out of the employment." *Jordan v. United Methodist Urban Ministries, Inc.,* 740 S.W.2d 411, 412 (Tenn. 1987). Instead, the injury must result from a danger or hazard peculiar to the work or be caused by a risk inherent in the nature of the work. *Thornton v. RCA Serv. Co.,* 221 S.W.2d 954, 955 (Tenn. 1949).

Here, Mr. Willis' job required him to tie baling wires on the back of the baling machine. Mr. Willis testified that the floor behind the machine was even, and there were no standing puddles of water or other substances that constituted a special hazard. All Staff argued extensively that the absence of a special hazard renders this claim non-compensable. The Court previously denied Mr. Willis' request for temporary disability and medical benefits upon a finding of noncompensability. The key difference between the circumstances under which the Court rendered the Expedited Hearing Order and the circumstances as they stand at the Compensation Hearing is the addition of Mr. Willis' credible, detailed testimony. When the Court entered the Expedited Hearing Order, it did so without the benefit of any sworn testimony. Mr. Willis did not provide an affidavit and, at Mr. Willis' request, the Court rendered its decision based on a review of the file without convening an evidentiary hearing. Essentially, the Court had no reliable factual basis to support an award of benefits at that time and had no choice but to deny his benefits request.

At the Compensation Hearing, Mr. Willis credibly testified that his job required him to work in a confined space that limited his movement. He also physically demonstrated how he performed these activities. Due to the size of the space, Mr. Willis had to contort his body into an odd position to perform his employment activities. Based on his testimony, the Court finds that the work environment constituted a special employment hazard. His duty to complete the job as assigned and in the space provided gave rise to the special hazard and constituted a causal connection between work and the injury.

Furthermore, the workplace activities were the sole cause of his injury. While Mr. Willis previously suffered from knee problems, the prior knee problems resolved after surgery and he had no other problems for nine years until the current injury, except for occasional pain. Accordingly, the Court finds that the work conditions contributed more than fifty percent in causing his injury considering all causes.

Having determined that Mr. Willis' job duties presented a special hazard that contributed to his injury, the Court now turns to the issue of medical causation. Except in "the most obvious, simple and routine cases," a workers' compensation claimant must establish by expert medical testimony that he or she is injured and that there exists a causal relationship between the injury and the claimant's employment activity. *Wheetley*

11

*v. State*, No. M2013-01707-WC-R3-WC, 2014 Tenn. LEXIS 476 (Tenn. Workers' Comp. Panel June 25, 2014) (citing *Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 274 (Tenn. 2009); *Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 638, 643 (Tenn. 2008)).

Both attorneys questioned Dr. Moore extensively concerning medical causation. Much of the testimony is recounted in this order. The Court finds, however, that Mr. Willis does not need expert medical evidence to establish causation in this case because he suffered an "obvious" injury on July 30, 2014. Mr. Willis testified that he moved to rise from the squatting position behind the baling machine when he "felt a sharp, quick pain in my knee and I immediately fell down to the ground grabbing my leg. I looked down; I saw my kneecap was out of place." He further stated that the kneecap had shifted completely to the right, so that it was located on the inside of his left leg. The Court finds the injury akin to a severely broken bone and was so obvious that the undersigned does not need expert medical testimony to establish medical causation. Furthermore, although Dr. Moore's opinions seemed to fluctuate over the course of the deposition, the Court alternatively finds that his opinion satisfied the medical causation standard. (*See* Ex. 8 at 8-10.)

The Court further finds that the injury contributed more than 50% in his current need for medical treatment. *See* Tenn. Code Ann. § 50-6-102(13)(C) (2014). Dr. Moore recommended that Mr. Willis undergo therapy, and possibly undergo surgery if the therapy does not stabilize his knee. Ruling out the pre-existing condition as the cause of his injury, which the Court has, leaves only the workplace accident as the cause of his dislocation, which resulted in his need for medical treatment.

Mr. Willis established that he suffered an injury that arose primarily within the course and scope of his employment for All Staff. Accordingly, the Court holds that Mr. Willis suffered a compensable injury to his left kneecap on July 30, 2014.

### III.  Medical and Temporary Disability Benefits

The Workers' Compensation Law provides that the employer shall furnish, free of charge to the employee, such medical treatment made reasonably necessary by the accident. Tenn. Code Ann. § 50-6-204(a)(1)(A) (2014). The Court, therefore, finds that All Staff shall be required to provide Mr. Willis further treatment for his knee with Dr. Moore. In addition, All Staff shall pay the past medical bills for, and any other medical bills related to, Mr. Willis' treatment with Dr. Moore for the July 30, 2014 left-knee injury.

Further, All Staff shall pay for any additional reasonable, necessary, and related medical care provided by Dr. Moore, whom the Court appoints as the authorized treating physician. The Court finds the appointment appropriate, considering the length of time since the accident and All Staff's failure to provide a panel of physicians for follow-up

care after the emergency room released Mr. Willis' with a diagnosis of a dislocated left kneecap.

Finally, Mr. Willis has requested temporary disability benefits. An employee is entitled to receive temporary total disability benefits pursuant to Tennessee Code Annotated § 50-6-207(1) whenever the employee suffers a compensable, work-related injury that renders the employee unable to work. *See Simpson v. Satterfield,* 564 S.W.2d 953 (Tenn. 1978); Tenn. Code Ann § 50-6-207(1) (2014). In order to establish a *prima facie* case for temporary total disability benefits, the worker must show that (1) he or she is totally disabled and unable to work due to a compensable injury, (2) the work injury and inability to work are causally connected, and (3) the duration of the disability. *Gray v. Cullom Machine, Tool & Die, Inc.*, 152 S.W.3d 439, 443 (Tenn. 2004). Entitlement to temporary total disability benefits ends whenever an employee is able to return to work. *Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770, 776 (Tenn. 2000). Temporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery. *Williams v. Saturn Corp.*, No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, 7 (Tenn. Workers' Comp. Panel Nov. 15, 2005).

Dr. Moore cleared Mr. Willis to resume working but imposed workplace restrictions. According to Mr. Willis' testimony, All Staff could not accommodate his restrictions. Mr. Willis also testified that he looked for other work, but his knee injury hindered his ability to find a job. Under these circumstances, the Court finds an award of temporary partial disability benefits appropriate.

Dr. Moore imposed Mr. Willis' restrictions on August 14, 2014, and scheduled a return visit for September 18, 2014. Dr. Moore may have lessened the severity of the restrictions at the return visit, but that information is not before the Court. As of the time of the Compensation Hearing, Dr. Moore had not lessened the restrictions. Mr. Willis, however, returned to work around the beginning of May 2015, ending his entitlement to temporary disability benefits, absent proof that he earned less money at his new job. Mr. Willis provided no evidence on this issue. Without a specific date or post-injury wage information, the Court will set the date of return as May 1, 2015, and find that Mr. Willis earned the same or a greater rate of pay at his new job. Accordingly, All Staff must provide Mr. Willis temporary partial disability benefits for the period from August 14, 2014, to May 1, 2015. This is a period of thirty-seven weeks and one day at a compensation rate of $285.93 for a total of $10,620.26.

**IT IS, THEREFORE, ORDERED** as follows:

1. All Staff or its workers' compensation carrier shall pay all outstanding medical bills for treatment of Mr. Willis' July 30, 2014 left-knee injury.

2. All Staff or its workers' compensation carrier shall provide continued medical care for Mr. Willis' left-knee injury with the authorized treating physician, Dr. David Moore, as required by Tennessee Code Annotated section 50-6-204 (2014). Medical bills shall be furnished to All Staff or its workers' compensation carrier by Mr. Willis or Dr. Moore.

3. The amount of temporary partial disability benefits is $285.93 per week. Payment of past-due benefits in the amount of $10,620.26 shall be made for the period from August 14, 2014, to May 1, 2015.

4. This matter is set for a status conference on Monday, November 16, 2015, at 10:00 a.m. (CDT), at which time the Court and the parties will discuss scheduling the second half of this bifurcated proceeding to address permanency. The Court will convene the status conference telephonically. The parties must call (615) 741-2113 to participate.

5. This order shall not constitute a final judgment under Rule 58 of the Tennessee Rules of Civil Procedure.

6. **The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.**

**ENTERED this the 25th day of August, 2015.**

_____
**Joshua Davis Baker, Judge**
**Court of Workers' Compensation Claims**

14

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 25th day of August, 2015.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|---|---|---|---|---|---|---|
| Gene Hallworth | | | | | X | hallworthg@aol.com |
| Duane Willis | | | | | X | dwillis@morganakins.com |
| Richard Clark | | | | | X | rclark@morganakins.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov